UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA,

08 CR 382 (SJ) (SMG)

-against-                                    **MEMORANDUM &**
**ORDER**


HUONG THI KIM LY,

                              Defendant.
---------------------------------------------------------X
A P P E A R A N C E S

LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
By:     Soumya Dayananda
        Pamela Chen
Assistant United States Attorneys

EDWARD M. KRATT
350 Broadway
Suite 1202
New York, NY 10013
Attorney for Defendant


JOHNSON, Senior District Judge:

        Defendant Huong Thi Kim Ly ("Defendant") was convicted by jury verdict

of international parental kidnapping.  Defendant moves for judgment of acquittal

pursuant to Federal Rule of Criminal Procedure 29(c) ("Rule 29") or, in the

alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule

33"). For the following reasons, the Rule 29 motion is DENIED and the Rule 33 motion is GRANTED.

## BACKGROUND

On May 24, 2008, Defendant was arrested pursuant to a complaint. On June 5, 2008, a grand jury returned an indictment charging her with international parental kidnapping in violation of 18 U.S.C. § 1204(a).[1] Trial began on December 9, 2010. At the close of the Government's case, Defendant moved for a Rule 29 judgment of acquittal; the Court denied the motion. (Trial Transcript ("Tr.") 292–93.) On December 16, 2010, the jury found Defendant guilty of the sole count of the indictment. After the verdict, the Defendant renewed her motion for acquittal. (Tr. 605.) The following is a summary of the evidence adduced at trial.

Tony Lam ("Lam"), a United States citizen living in New York City, met Defendant, a Vietnamese actress, in Ho Chi Minh City, Vietnam around August 2000. While in Vietnam, the two dated for a short time and became engaged within a few months. In January 2001, Defendant moved to the United States to live with Lam in New York. Shortly after her arrival to New York, Defendant became pregnant. On February 6, 2001, Defendant and Lam were married in Las Vegas, Nevada. In April 2001, Defendant applied for a visa based upon her marriage to a United States citizen. On October 17, 2001, Defendant gave birth to the couple's

---

[1] "Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be [guilty of a crime]." 18 U.S.C. § 1204(a).

daughter, P.L.  The family lived together in several different apartments in the Lower East Side neighborhood of Manhattan. In September 2005, Defendant received her permanent resident card.

In early November 2005, Lam traveled to Vietnam to sell a clothing store he and Defendant co-owned in Ho Chi Minh City. During this time, P.L. was enrolled at school in the neighborhood. When Lam departed for Vietnam, Defendant and P.L. stayed with Hoa Lam ("Hoa"), Lam's sister.  Upon his arrival to Vietnam, Lam spoke to Defendant twice on the telephone. During these conversations, Defendant never mentioned her intention to travel to Vietnam.

On or about November 20, 2005, Lam learned from a driver for Defendant's family that Defendant was scheduled to arrive in Vietnam the following day. After learning this information, Lam confronted Defendant's mother, who confirmed that Defendant was arriving to Vietnam the next day. Lam also called Hoa, who was in New York.  Hoa stated that Defendant had departed for Vietnam.

On November 22, 2005, Defendant and P.L. arrived in Ho Chi Minh City. Lam went to the airport to meet Defendant and P.L.  Defendant's family was present and Lam was unable to speak with Defendant at the airport.  Lam went with Defendant, P.L., and Defendant's family to the family home.  While there, Defendant told Lam that she wanted to keep P.L. in Vietnam and she did not want to return to New York. Defendant also told Lam that he would not see P.L. again unless he paid her money.  Lam gave Defendant's mother $2,000.  Soon after her

arrival, Defendant, along with her mother, agreed to meet Lam at a coffee shop. At this meeting, Defendant demanded another $2,000, which Lam gave to her.

From November 22, 2005 until the end of December 2005, Lam saw P.L. approximately three or four times in Vietnam. Lam returned to New York and called Defendant five or six times a day. Lam spoke with P.L. but Defendant's mother prevented him from speaking with Defendant.

In April 2006, Defendant's mother called Lam and asked him to return to Vietnam take Defendant and P.L. back to the United States. After his arrival in Ho Chi Minh City, Lam met with Defendant and her mother at a coffee shop. Lam agreed to sign a custody order awarding him custody of P.L. during the summers and Defendant custody during the school year in Vietnam. The order further provided that when P.L. reached age 12, she would return to the United States for college.

On May 18, 2006, Defendant and Lam appeared in court in Vietnam to sign the agreement. The document was rejected by the Vietnamese court because it was not in conformity with Vietnamese law. Defendant then sought to have Lam sign a custody agreement granting her sole custody of P.L. Lam refused to sign the agreement and observed Defendant sign his signature on the document.[2] That agreement is dated December 6, 2005.

---

[2] The parties agreed by stipulation that based upon examination of Government Exhibit ("GX") 11, no conclusion could be reached regarding whether the "Tony Lam" signature was or was not prepared by Lam. (See GX 24.)

Lam returned to New York and filed an affidavit in New York State Family Court seeking custody of P.L. In the affidavit, Lam stated that P.L. was being abused by Defendant's family members in Vietnam and that P.L. needed urgent dental care. By an order dated June 19, 2006, a New York State Family Court granted Lam sole custody of P.L. and ordered Defendant to return P.L. to New York.

After obtaining the New York State Family Court order ("New York Family Court order"), Lam returned to Vietnam and contacted the U.S. Consulate in Ho Chi Minh City. During an arranged visit with P.L. at the U.S. Consulate, Lam provided Defendant with the New York Family Court order. Lam also provided Defendant a summons issued by the New York Family Court ordering her to appear on September 11, 2006. Defendant did not appear for the September 11, 2006 court date. Defendant consulted with an attorney in Vietnam who advised her to file a written reply to the summons. From September 2006 until August 2007, Defendant was served with three additional court orders issued by the New York Family Court. Defendant did not appear for any court appearance. From June 2006 until November 2007, Lam traveled eight times to Vietnam to see P.L. However, Lam saw P.L. only three times, averaging five to ten minutes per visit.

In June 2007, Lam met with FBI Special Agent Timothy Wittman ("Wittman") concerning his case. Soon after, Wittman sought an arrest warrant in the Eastern District of New York. Defendant returned to the United States in May 2008 to renew her permanent resident visa. Defendant was arrested, pursuant to

warrant, when she arrived at Los Angeles International Airport. P.L. was not with her. While Defendant was in custody, she signed a consent form giving full custody to Lam. In June 2008, P.L. was returned to Lam at the U.S. Consulate in Ho Chi Minh City.

## DISCUSSION

### I. Rule 29 Motion for Judgment of Acquittal

Rule 29 provides that, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a); United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009).[3]  Accordingly, a court must uphold a jury verdict so long as "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]'"  United States v. Stewart, 590 F.3d 93, 109 (2d. Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). The Court views the evidence in the light most favorable to the Government, assuming that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution. United States v. Abu-Jihaad, 630 F.3d 102, 134 (2d Cir. 2010).  As a result, a defendant challenging the sufficiency of the evidence adduced at trial bears a "very heavy burden." United States v. Miller, 626 F.3d 682, 691 (2d Cir. 2010).

---

[3] The same standard applies where, as here, Defendant's motion was raised after jury verdict. See FED. R. CRIM. P. 29(c).

To sustain its burden at trial, the Government had to prove beyond a reasonable doubt that: (1) P.L. was previously in the United States; (2) Defendant took P.L. from the United States to Vietnam (or kept P.L. from returning to the United States from Vietnam); and (3) Defendant acted with the intent to obstruct the lawful exercise of parental rights of Lam, P.L.'s father. <u>See</u> 18 U.S.C. § 1204(a). Defendant argues that the trial evidence was insufficient to establish the third element, the requisite intent. (Def. Mem. 6.)

It is well-settled that "the <u>mens rea</u> elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." <u>United States v. MacPherson</u>, 424 F.3d 183, 189 (2d Cir. 2005); <u>see also, e.g.</u>, <u>Ratzlaf v. United States</u>, 510 U.S. 135, 149 n.19 (1994) (noting that the "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"). Here, the Government presented ample direct and circumstantial evidence of Defendant's conduct from which the jury could draw reasonable inferences regarding her intent.

Melinda Truong, the owner of the travel agency from which Defendant's tickets were purchased, testified that in November 2005, the travel agency issued one-way tickets for Defendant and P.L. from New York to Ho Chi Minh City. (Tr. 224, 228; "GX" 19-A, 19-B). Defendant testified to purchasing the tickets on November 18. (Tr. 368.) The date of departure for the tickets was November 20,

2005. (See GX 19.)[4] The fare for the tickets totaled $1,219, which included a $75 fee for an expedited visa for P.L. (Tr. 230.)

The Government also presented the testimony of Hoa, Lam's sister, regarding her interactions with Defendant in the days preceding Defendant's departure to Vietnam. (Tr. 247–92.) Hoa testified that when Lam left for Vietnam in November 2005, Defendant and P.L. stayed with Hoa's family. (Tr. 254–55, 273.) Hoa stated that on November 18, Defendant said she wanted to return to Vietnam and that she did not want to stay with Lam. (Tr. 256.) Hoa testified that on November 20, the date of Defendant's departure, Defendant went to the airport with P.L.; Hai Lam ("Hai"), Hoa's brother; Hai's wife and two children; and Hoa's two daughters. (Tr. 262.) Hoa stated that she observed Defendant with four suitcases, and that she gave Defendant $1,000 cash in a red envelope. (Tr. 261.) Lam also testified that he talked with Defendant on the phone when he went to Vietnam in November 2005 but Defendant did not tell him she was traveling to Vietnam. (Tr. 79–80.) Lam also testified that he learned of Defendant's trip to Vietnam from the driver of her family. (Tr. 81.) He called Hoa in New York and learned that Defendant had left for Vietnam. (Tr. 81–82.)

Viewing the evidence in the light most favorable to the Government, see Abu-Jihaad, 630 F.3d at 134, a jury could reasonably infer that Defendant purchased the one-way tickets with the intent to leave New York with P.L. and not return. The Court also assumes that the jury weighed Defendant's evidence and ultimately

---

[4] The itinerary for the trip states an issue date of November 10 or 18, 2005. (Tr. 225, GX 19-A.) The invoice (GX 19-B) shows a purchase date of November 18. (Tr. 228–29.)

resolved conflicts in favor of the Government.  Id.  Defendant testified that she only

bought a one-way ticket because Hai told her to do so, and that she only received

enough money from Hai to purchase a one-way fare.  (Tr. 369–70.) But this

testimony was contradicted on cross-examination when Defendant admitted to

spending money in various stores before buying the one-way ticket. (Tr. 407–09.)

The jury could infer that Defendant had money but chose to spend it on a one-way

ticket because she was not returning to the United States.  The jury could also infer,

from Defendant's statements to Hoa, from the presence of so many family members

at the airport, and from Defendant's acceptance of $1,000, that Defendant did not

plan to return from Vietnam.

Defendant argues also that the Government's case regarding intent to

unlawfully retain P.L. was based on Lam's uncorroborated testimony that he was

denied access to P.L. while in Vietnam.  The Court does not weigh the evidence,

however, "and thus any lack of corroboration is irrelevant because that speaks to the

weight and not the sufficiency of the evidence." United States v. Burden, 600 F.3d

204, 214 (2d Cir. 2010) (citing United States v. Hamilton, 334 F.3d 170, 179 (2d

Cir. 2003)).

Moreover, other evidence supports an inference of intent to unlawfully retain

P.L. in Vietnam.  Hoa testified that when she visited Vietnam in summer 2006,

Defendant stated to her that she would not return to New York.  (Tr. 263–64.)

Further, Defendant testified that she met with a lawyer in Vietnam to discuss a

divorce within a few days of her arrival.  (Tr. 428.)  She also stated that she had

prepared a divorce decree which gave her sole custody of P.L. in Vietnam until the child reached age 12. (Tr. 382–83.)   Defendant also failed to appear for court appearances in New York Family Court from September 2006 to August 2007, despite receiving court orders. (Tr. 388–92, 433–36; <u>see also</u> GX 15-A, 15-B, 15-C & 15-D.)  Defendant traveled to the United States without P.L. during the same time period, however, to renew her visa and to attend a martial arts conference.  (Tr. 434, 436–37; <u>see also</u> GX 38.)  The jury could reasonably infer, from Defendant's travel to the United States without P.L., her initiation of divorce and custody proceedings in Vietnam, and from her failure to appear in New York Family Court that Defendant intended to keep P.L. in Vietnam in contravention of Lam's parental rights.

Finally, Defendant claims that the testimony of defense witnesses, including her own testimony, contradict that of the Government's.  For example, Nguyen Thu Thuy Huong, Defendant's Vietnamese attorney from June 2006 to May 2007, testified that she sent letters to the New York State Family Court in response to the court orders.  (Tr. 323–24.) "But advancing a different assessment of the evidence or urging conflicting inferences therefrom does not demonstrate a legal inadequacy in the government's proof."  <u>See, e.g.</u>, <u>United States v. Fields</u>, 516 F.3d 923, 943 (10th Cir. 2008). Instead, the Court considers the evidence and available inferences in a light most favorable to the Government, and assumes that the jury did not credit Defendant's testimony or that of her witnesses. <u>United States v. Heras</u>, 609 F.3d

101, 103 (2d Cir. 2010). Accordingly, Defendant's Rule 29 motion for judgment of acquittal is denied.

## II. Rule 33 Motion for New Trial

Rule 33 permits a district court to grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). "This rule 'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" United States v. Polouizzi, 564 F.3d 142, 159 (2d Cir. 2009) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). "In deciding whether to grant a motion for a new trial, the judge is not required to view the evidence in the light most favorable to the prosecution." United States v. Levy, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009) (internal quotation marks omitted). In addition, "the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005) (internal quotation marks omitted).[5] "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, 'it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of the credibility assessment.'" United States v. Ferguson, 246 F.3d 129, 133–34 (2d Cir. 2001). "The ultimate test

---

[5] But see United States v. Thorpe, 122 F.3d 1058, 1997 WL 434086, at *2 (2d Cir. Aug. 1, 1997) (unpublished) ("[A] court should not substitute its own determination of the credibility of the witnesses for that of the jury.") (citations and internal quotation marks omitted).

on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Id. at 134.

Here, Defendant argues that a new trial is warranted because: (1) the jury verdict was against the weight of the evidence; (2) restrictions on the testimony of defense witness Martin Oppus ("Oppus") violated due process; (3) prosecutorial misconduct violated due process; and (4) this Court failed to charge the jury regarding the alleged fraudulent custody order and the definition of "domestic violence" in the IPKCA affirmative defense, and therefore violated Defendant's due process rights. (Def. Mem. 10–22.) As a threshold matter, Defendant's Rule 33 motion on the grounds of the weight of the evidence is denied. The Court has already considered and rejected these arguments as a basis for Defendant's Rule 29 application, and finds them similarly deficient as the basis for a Rule 33 motion. The Court will examine Defendant's remaining arguments.

### A. Restrictions on Oppus's Testimony Were Not Improper

Oppus was the Foreign Service officer stationed at the U.S. Consulate in Ho Chi Minh City from August 2006 to June 2010. Defendant argues that Oppus' testimony regarding P.L.'s "sound physical and psychological condition" was improperly restricted by the U.S. Department of State ("the Department") before trial and by the Government's objections during trial. (Def. Mem. 14–15.)

In pre-trial motions, Defendant moved to compel Oppus's testimony in order to refute Lam's allegations of abuse that formed the basis of the New York Family Court petition and custody orders. (See Docket Entry Nos. 31, 33.) Accordingly,

Defendant requested that Oppus testify regarding the physical and mental well-being of P.L., his contact with and observations of P.L., his efforts to investigate Lam's allegations of abuse, and his conclusions that no abuse occurred. (See Docket Entry No. 36 at 8.) The Government moved to limit the scope of Oppus's testimony because Oppus, as a lay witness, is not qualified to testify about P.L.'s physical and mental condition. (See Docket Entry No. 39 at 7–8.) On the first day of trial, the Court ruled that Oppus could testify about his physical observations of P.L., but not whether P.L. was molested or as to P.L.'s mental condition. (Tr. 14.) During the trial, the Court sustained the Government's objections to several lines of questioning regarding Lam's allegations that P.L. was being abused by Defendant's family members in Vietnam, P.L.'s general health, and Oppus's impressions of P.L. (Tr. 201–03.)

It is well-settled that a government employee may not be compelled to testify as to specific matters where appropriate agency authorization has not been given. See generally United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951) (holding that a government employee may not be held in contempt for failing to produce documents where appropriate agency authorization had not been given). Oppus, an employee of the Department, may not testify regarding information acquired in the scope of his official duties without express permission. 22 C.F.R. § 172.4; see also id. § 172.5(a) (permitting Department employees to testify only concerning matters which were specified in writing and properly approved by the appropriate Department official). Here, the Department permitted Oppus to testify

as to: (1) procedures at the U.S. Consulate General in Ho Chi Minh City regarding welfare and whereabouts and parental visits to children; (2) how these procedures operated in the case of P.L.; (3) events in this case Oppus personally observed; and (4) events observed by Oppus's subordinates and reported in official cables or documents. (Def. Mem. Ex. A (Authorization for Dep't of State Testimony dated Dec. 2, 2010) ("Authorization") at 1.) Defendant could and did ask Oppus about these topics on direct examination. (Tr. 199–200, 201–02, 204–07.)

The Department also expressly declined to waive its prohibition against its employees giving expert or opinion testimony based on information acquired in the scope and performance of their official Department duties, and therefore prohibited Oppus from testifying as to: (1) Oppus's view on the relative parental fitness of Defendant and Lam; (2) the merits of their custody dispute; (3) the mental state or condition of either parent; and (4) P.L.'s physical or mental health to the extent such testimony would call for medical or other specialized knowledge or expertise. See Authorization at 1 (citing 22 C.F.R. § 172.9(a).) To the extent that Defendant argues that the Department cannot restrict Oppus's testimony, her claim is foreclosed by the Supreme Court. See Touhy, 340 U.S. at 468.[6]

Defendant further argues that the prosecution improperly objected to Oppus's testimony about Lam's credibility even though it was aware that consular

---

[6] Even if the Department's Touhy regulations did not restrict Oppus's testimony, the Government's objections were properly sustained because, as a lay witness, Oppus is not an expert or medical doctor. See FED. R. EVID. 701 (testimony by lay witnesses cannot be based on scientific, technical, or other specialized knowledge; see also FED. R. EVID. 702–705 (setting forth requirements for expert testimony).

officials in Vietnam believed that Lam's allegations of abuse were "unfortunate" and without merit. But Defendant was not precluded from questioning Oppus about his observations of P.L. (Tr. 220–21.) Moreover, Defendant had the opportunity to cross-examine Lam regarding the allegations of abuse and to question Lam's credibility as to the allegations. Oppus's testimony regarding the same would have been improper extrinsic impeachment evidence. See Fed. R. Evid. 608(b). Therefore, it was proper to limit Oppus's testimony regarding Lam's credibility.

In sum, there were no improper restrictions on Oppus's testimony sufficient to warrant a new trial.

### B. There Was No Prosecutorial Misconduct

Next, Defendant argues that the prosecution engaged in misconduct by (1) restricting Oppus's testimony regarding P.L.'s well-being and Defendant's cooperation to provide Lam access to P.L.; and (2) presenting speculative and prejudicial evidence and argument regarding Defendant's bad motive to leave in November 2005 and Defendant's parental fitness. The Court has already rejected Defendant's arguments regarding the restrictions on Oppus's testimony as to P.L.'s well-being. The Court also finds that Defendant successfully elicited, on direct examination, Oppus's testimony regarding Defendant's cooperation. (See Tr. 205.)

Defendant's remaining claims of prosecutorial misconduct are without merit. "'It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.'" United States v. Payton, 159 F.3d 49,

58 (2d Cir. 1998) (quoting <u>United States v. Havens</u>, 446 U.S. 620, 626–27 (1980));

<u>see also</u> <u>United States v. Beverly</u>, 5 F.3d 633, 639 (2d Cir. 1993) ("Where a

defendant testifies on direct about a specific fact, the prosecution is entitled to prove

on cross-examination that he lied as to that fact.").

Defendant protests several lines of cross-examination, but Defendant opened

the door for each on direct examination.  For example, Defendant argues that the

Government lacked a good faith basis for seeking to establish a bad motive for

Defendant to leave New York in November 2005, namely, her receipt of a

permanent resident visa in September 2005.  (Def. Mem. 18.)  On direct

examination, however, Defendant provided a timeline of her relationship with Lam

and her living conditions with him before she left for Vietnam.  (Tr. 353–66.)

Defendant testified regarding the abuse she suffered from Lam in 2004 and 2005.

(Tr. 363–65.) She then testified that she went to Vietnam in November 2005 to help

Lam resolve problems with the business she owned there.  (Tr. 368.) On cross-

examination, Defendant admitted that she had no knowledge of the business, despite

the business being in her name.  (Tr. 425–26.) She also admitted that she applied for

a permanent resident visa in October 2004 and received the resident visa in

September 2005.  (Tr. 440–42.)  The cross-examination regarding the permanent

resident visa was consistent with the direct examination testimony regarding the

timeline of her relationship to Lam and Defendant's motive to leave the United

States in November 2005.  That the jury requested clarification as to the date

Defendant received the permanent resident visa (Tr. 597) shows that the jury weighed Defendant's responses on direct and cross-examination.

Defendant's remaining claims of improper cross-examination fare no better. For example, Defendant claims the Government improperly elicited evidence regarding her "extravagant" spending. (Def. Mem. 18.) On direct examination, Defendant testified that she did not use the ATM card on the joint bank account she had with Lam. (Tr. 359.) On cross-examination, however, she conceded that she used the ATM card on the account to purchase nearly $1,000 worth of merchandise on November 14, 15, and 16, just days prior to her departure from New York. (Tr. 407–09.)

As another example, Defendant argues that the Government engaged in improper character assassination because of questions about her acting career and her "spoiled nature." (Def. Mem. 18–19.) On direct, she stated that her last film was in 2000 (Tr. 353.); but on cross-examination, she stated that she starred in her most recent film in 2006 (Tr. 400). On direct examination, Defendant testified as to her living conditions with Lam at 272 Canal Street in a cold apartment with no stove or bathtub. (Tr. 356–57.) On cross-examination, however, the Government introduced photographs of the well-furnished apartment; Defendant stated that she only meant the stairs outside the apartment were "very dirty." (Tr. 448–49; GX 5.) For each of these lines of direct examination, the Government properly cross-examined Defendant to test the veracity of her direct testimony. <u>See</u> <u>Beverly</u>, 5

F.3d at 639. Moreover, none of the lines of cross-examination even remotely commented on Defendant's fitness as a parent.

Defendant also cannot claim misconduct because of the Government's summations regarding Defendant's bank statements. On cross-examination, the prosecutor marked Defendant's bank statements for identification, but the Court denied the request to enter the statements as evidence. (Tr. 409–10.) The Court also sustained defense counsel's objections to questions regarding the contents of the bank statements. (Tr. 410–11.) During summation, the prosecutor stated, "You saw the defendant on the stand when confronted with her own bank records. It is clear, the defendant had access to money." (Tr. 495.) Nothing in these statements is improper because the Government elicited testimony from Defendant that she had access to the money in the account when she went shopping with the account's ATM card a few days before her departure to Vietnam in November 2005. (Tr. 407–09.) The comment "You saw the defendant on the stand" invited the jury to recall its observations of Defendant during her testimony, which is part of the jury's function. Moreover, the Court instructed the jury that attorneys' arguments are not evidence (Tr. 549) and that Defendant's testimony, including any underlying motives, should be considered as would any other witness's. (Tr. 558, 560.) Because the Court presumes that the jury follows instructions, see, e.g., United States v. Sabhnani, 599 F.3d 215, 240 (2d Cir. 2010); United States v. Stewart, 433 F.3d 273, 310 (2d Cir. 2006), Defendant was not harmed by the summation

arguments. Therefore, there is no prosecutorial misconduct upon which Defendant's request for a new trial may be granted.

### C. Defendant Was Not Prejudiced by the Failure to Charge Regarding the New York Family Court Order But Was Prejudiced by the Failure to Supplement Jury Instructions

When a court refuses a defendant's requested jury charge, the defendant must show that the requested instruction "accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." United States v. Abelis, 146 F.3d 73, 82 (2d Cir. 1998) (internal citations and quotations omitted).

1. Requested Charge Regarding the New York Family Court Order

Before summation, the Court denied Defendant's request to charge regarding the legal effect of the New York Family Court order:

**Defense Request to Charge No. 15**

A Court Order obtained through the use of false, fraudulent and/or perjured testimony is void, ab initio, i.e., at its inception, and, hence, has no legal force and effect.

If you find that the allegations contained in the June 19, 2006 Petition of Tony Lam, which was submitted to the New York Family Court in order to obtain a custody order therefrom, are false, fraudulent and/or perjurious, then you must conclude that the custody orders subsequently issued as a result thereof, had no legal force and effect.

(See Docket Entry No. 48.) Defendant argues that the jury should have been able to consider the validity of the New York Family Court order because the Government emphasized Defendant's lack of response to and failure to appear in the New York

Family Court. (Def. Mem. 19–21.) That reasoning is insufficient to meet Defendant's burden to show that the requested instruction accurately represented the law. In fact, Defendant offers no authority for the jury request. Moreover, Defendant cannot show that she was prejudiced by the failure to include the charge. Defendant was able to cross-examine Lam regarding the allegations of abuse underlying the New York Family Court order (Tr. 159–61), and argued in summation that the petition was obtained fraudulently (Tr. 509–10, 511–15). Therefore, Defendant will not be granted a new trial on this ground.

2. Supplemental Instruction Regarding Affirmative Defense

Before the case was submitted to the jury, Defendant requested a charge regarding the IPKCA affirmative defense that "the defendant was fleeing an incidence or pattern of domestic violence." See 18 U.S.C. § 1204(c)(2). The Court charged the jury as follows:

> The defendant in this case has raised the defense that at the time of the removal of the child from the United States, the defendant was fleeing an incidence or pattern of domestic violence. Incidence means the occurrence of.

> I instruct you that it is a defense to the charge in the indictment that the defendant was fleeing an incidence or pattern of domestic violence if the defendant proves that this was the case by a preponderance of the evidence. As I told you, the defendant has the burden of proving this defense by a preponderance of the evidence. To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true. It is determined by considering all of the evidence and deciding which evidence is more convincing.

> In determining whether the defendant has proven this defense, you may consider the relevant testimony of all witnesses,

regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them. If the evidence appears to be equally balanced, or you cannot say upon which side it weighs heavier, you must resolve this question against the defendant. However, it is important to remember that the fact that the defendant has raised this defense does not relieve the government of the burden of proving all of the elements of the crime as I have defined them, that the child was previously in the United States, that the defendant removed the child from the United States and that the defendant acted with the intent to obstruct the lawful exercise of parental rights of Tony Lam. These are things that the government still must prove beyond a reasonable doubt.

(Tr. 572–73.)[7] During deliberations, the jury sent a note to the Court stating, "Definition of domestic violence." (Tr. 591.) Outside the jury's presence, the Court convened the parties to discuss a potential response. Defense counsel proposed a definition that includes more than physical assault, such as a pattern of emotional or sexual violence. (Tr. 583–84, 591.) The Government argued that the term "violence," without the modifier "domestic," retains a common sense meaning—in other words, only physical violence. (Tr. 585–86.) Ultimately, the Court instructed the jury as follows:

Ladies and gentlemen, we are dealing with a statute that was passed by Congress, and that is 18 USC [sic], Section 1204, and when Congress passed this law they mentioned the term domestic violence but they never defined what domestic violence was.

There is no case law on what is domestic violence so you have to use your common sense, what you think domestic violence is. Okay?

---

[7] See also 2 L. Sand, et al., MODERN FEDERAL JURY INSTRUCTIONS—CRIMINAL, Instr. 42–22 (2010). During a sidebar before summations, the Government requested a definition of the term "incidence," which was added to the first paragraph. (Tr. 484–85.)

(Tr. 592.)  Defendant argues that Defendant was prejudiced when the Court failed to provide guidance as to an essential element of the affirmative defense.  (See Def. Mem. 21–22.)

When Congress fails to define a statutory term, the Court interprets the statutory subsection by "giving the words used their ordinary meaning."  United States v. Johnson, 968 F.2d 208, 212 (2d Cir. 1992) (citations and quotations omitted).  Here, Congress failed to define the term "domestic violence" in the statute, the legislative history is silent, and no case law discusses the scope of domestic violence in the IPKCA context.  According to the Government, the ordinary meaning of "domestic violence" requires the Court to separate the two terms: "domestic," involving the members of the same family or household, and "violence," the use of physical force.  But that is not the only definition.  For example, domestic violence is also defined as "the creation of a reasonable fear that physical injury or harm will be inflicted, by a parent or a member or former member of a child's household, against a child or against another member of the household." BLACK'S LAW DICTIONARY 1705–06 (9th ed. 2009) (emphasis added).  This definition implies that, for example, a husband can create fear of physical harm against his wife without laying a hand on her, perhaps through verbal threats, non-physical gestures, or psychological means.[8]  Defendant's proposed definition of

---

[8]  Indeed, the Department of Justice adopts a similarly broad definition of domestic violence:

> We define domestic violence as a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner.  Domestic violence can be physical, sexual, emotional, economic,

emotional, sexual, or physical violence encompassed the broad definition of domestic violence and, therefore, was legally correct.

The question is whether Defendant was prejudiced by the failure to include the broad definition in the supplemental instruction to the jury. The Court is convinced that she was. Domestic violence is an essential element of the § 1204(c)(2) affirmative defense. The supplemental instruction would have advised the jury that domestic violence involves more than physical injury, including emotional and sexual violence. The jury could then assess whether the trial testimony and evidence was sufficient to meet this broad definition by a preponderance. Instead, Defendant was hamstrung in her ability to prove her affirmative defense.

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." <u>Ferguson</u>, 246 F.3d at 134. The Court is convinced that a manifest injustice would result from a guilty verdict in this case. Congress's failure to define "domestic violence," an essential term in the IPKCA affirmative defense, was the same as depriving Defendant of the defense altogether. Because the IPKCA affirmative defense was not available to Defendant, she was sufficiently prejudiced to warrant a new trial.

---

or psychological actions or threats of actions that influence another person. This includes <u>any behaviors</u> that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound someone.

U.S. Dep't of Justice, Office on Violence Against Women, About Domestic Violence, http://www.ovw.usdoj.gov/domviolence.htm (last visited July 22, 2011) (emphasis added).

## CONCLUSION

For all the foregoing reasons, Defendant's Rule 29 motion is DENIED and

her Rule 33 motion is GRANTED.


**SO ORDERED.**

Dated: July 22, 2011                    _____/s/_____
      Brooklyn, NY                              STERLING JOHNSON, JR.
                                 Senior United States District Judge